CLAY, Circuit Judge, concurring in part arid dissenting in part. The majority spends the bulk'of its opinion explaining how Officer Phillips’ use of deadly force was objectively unreasonable, citing case upon case (mariy from before 20Í0, the year of the incident in question) to conclude that Officer Phillips violated Latits’ ’constitutional rights. In the final stretch,'" however, the' majority abruptly shifts gears to hold 'that Latits’ constitutional ' rights were not clearly’established and that Officer Phillips is therefore entitled to qualified immunity. In so holding, the majority has created a nearly impenetrable barrier for plaintiffs seeking to vindicate their rights against governmental officials. Because I believe that the majority opinion is contrary to- governing case law, which clearly establishes that an officer may not shoot ;a fleeing suspect who poses no danger to others, I respectfully dissent. The facts, as revealed by the record and as presented by the majority, are as follows: On the night of June 24,2010, City of Ferndale Police stopped Latits for turning the wrong way onto a divided boulevard. Officer Jaklic approached the car and noticed Latits attempting to hide, what appeared to be drugs. Jaklic told . Latits to get out of the car, and Latits took, off. Three squad cars then,pursued Latits on a chase through a parking lot and down an empty highway at speeds not exceeding 60 m.p.h. Latits’ vehicle came to a temporary halt when he tried to make a U-turn over the curb of the grassy highway median. At this point, Officer Wurm attempted to make the same U-turn and hit Latits’ vehicle., Officer Wurm tried to reorient his vehicle, and he hit Latits a second time. Latits straightened out his vehicle and began traveling northbound, when, about five seconds later, Officer Phillips sped past Jaklic and Wurm and rammed into Latits, thrusting Latits’ car across two lanes of traffic and off the road. Latits spun out to an area of grass and concrete, leaving him parallel with Phillips’ car, thus ending the chase. All told, the chase lasted about three minutes. And through the entirety of it, the only collisions that Officer Phillips saw occurred when Officer Wurm twice hit Latits, and when Phillips, himself, rammed into Latits’ back left. From Phillips’ vantage point, he could see that Latits had repeatedly tried to maneuver around the officers’ cars to avoid hitting them. With Latits stopped, Officer Wurm pulled onto the grass parallel to Latits and opposite from Phillips. Latits slowly began to drive forward through the opening between Phillips and Wurm, while Officer Jaklic slowly drove toward Latits’ front to block him in. Látits and Jaklic had a very low-speed head-on collision, in which Jaklic was not injured and his car sustained minimal damage. In violation of police procedure, Officer Phillips jumped out of his car and ran toward Latits’ car from behind it. Phillips was standing alongside Latits’ front passenger-side door as Latits started backing away from Officer Jaklie’s car. Although Phillips could see that no cars or persons were immediately behind Latits as he reversed, Phillips opened fire on Latits, and Latits’ car rolled to a stop. Latits was struck by three bullets and died at the hospital later that morning. The unconstitutional nature of Phillips’ conduct would have been clear to a reasonable police officer. Indeed, it was clearly established under Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d. 1 (1985), that police officers may not fire at non-dangerous fleeing felons such as La-tits. See Bouggess v. Mattingly, 482 F.3d 886, 894-95 (6th Cir. 2007) (applying Garner to hold that an officer who employs deadly force against a fleeing suspect without reason to believe that the suspect is armed or otherwise poses a serious risk of physical harm is not entitled to qualified immunity). In Gamer, the Supreme Court held that the “use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.” 471 U.S. at 11, 105 S.Ct. 1694 (“Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.”). Although Gamer did not involve a preceding car chase, its holding was clear enough to have placed Phillips on notice that his conduct was unconstitutional. Bouggess, 482 F.3d at 895 (“Our circuit and others have held that some cases can be so obvious under Gamer and governing circuit precedent that officers should be presumed to have been aware that their conduct violated constitutional standards”) (citing Sample v. Bailey, 409 F.3d 689, 699 (6th Cir. 2005) and Dickerson v. McClellan, 101 F.3d 1151, 1163 (6th Cir. 1996)). Gamer made plain that deadly force cannot be used against an escaping suspect who does not pose an immediate danger to anyone. That rule applies here, where reasonable police officers in Phillips’ position would not have perceived a threat or danger to public safety. This conclusion is not changed by the fact that the seizure occurred following a car chase that was not executed under hazardous circumstances and where no parties (except evidently the decedent) were at risk; The majority relies on Mullenix v. Luna, — U.S. —, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015), to hold that it was not clearly established that an officer in Phillips’ position was prohibited from using deadly force against a fleeing suspect. In Mullenix, officers approached the plaintiffs car and told him that he was under arrest. 136 S.Ct. at 3Ó6, The plaintiff sped off and led police “on an 18-minute chase at speeds between 85 and 110 miles per hour.” Id. During the pursuit, the plaintiff twice called the police dispatcher “claiming to have a gun and threatening to shoot at police officers if they did not abandon their pursuit.” Id; A police officer positioned himself on a highway overpass and fired at the vehicle, killing the plaintiff. Id. The relevant inquiry, the Court explained, “was whether it was clearly established that the Fourth Amendment prohibited the officer’s conduct in the [particular] situation [he] confronted.” Id. (internal quotation marks and citation omitted). The Court concluded that none of its precedents “squarely governed]” the facts presented, and therefore, “[e]ven accepting that these circumstances fall somewhere between [existing cases], qualified immunity protects actions in the. ‘hazy border between excessive and acceptable force.’ ’.’ Id. at 306, 312 (quoting Brosseau v. Haugen, 543 U.S. 194, 201, 125 S.Ct, 596, 160 L.Ed.2d 583 (2004)). Nonetheless, the Court distin-guishéd Mullenix from other cases where the circuits denied immunity to officers who shot suspects “who may have done little more than flee at relatively low speeds.” Id. at 312 (citing Walker v. Davis, 649 F.3d 502, 503 (6th Cir. 2011); Kirby v. Duva, 530 F.3d 475, 479-80 (6th Cir. 2008); Adams v. Speers, 473 F.3d 989, 991 (9th Cir. 2007); Vaughan v. Cox, 343 F.3d 1323, 1330-31, and n.7 (11th Cir. 2003)). Unlike Mullenix, this- is not a case where a police officer may have needed more judicial guidance to determine whether the particular risk justified the use of deadly force. Indeed, the majority concludes that Latits “did not present an imminent or ongoing danger” to officers or to any civilians. This case therefore falls into the category of cases that Mullenix distinguished—ie., those squarely controlled by Gamer. In reaching its conclusion that Laths’ right to be free from the use of deadly force in these circumstances was not clearly established, the majority markedly raises the legal barrier posed by the qualified immunity defense beyond any existing legal standard, making it virtually impossible for plaintiffs to overcome the defense even under circumstances where then-rights have obviously been violated. The majority quotes Mullenix as holding that “[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.” 136 S.Ct. at 308 (internal quotation marks and citation omitted). The majority then takes this general proposition and applies it literally, asking whether—along a continuum of more or less reasonable officials—any official could have believed that he was not violating the right. If any official could have so believed, the majority seems to conclude, then the right was not clearly established and hence there was no actionable violation. Under the majority’s standard, no plaintiff could overcome a qualified immunity defense if any official could conceivably believe that he was not violating the plaintiffs rights. But this newly minted standard is not the law. Instead, “the crux of the qualified immunity test is whether officers have ‘fair notice’ that they are acting unconstitutionally.” Mullenix, 136 S.Ct. at 314 (Sotomayor, J., dissenting) (citing Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)); see Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (“The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.”). It was clearly established at the time of the shooting, based on Supreme Court and Sixth Circuit caselaw, that an officer may not use deadly force against a fleeing felon who poses no threat to others. Indeed, as early as 1983, this Court held: Before taking the drastic measure of using deadly force as a last resort against a fleeing suspect, officers should have probable cause to believe not simply that the suspect has committed some felony. They should have probable cause also to believe that the suspect poses a threat to the safety of the officers or a danger to the community if left at large. Garner v. Memphis Police Dept., 710 F.2d 240, 246 (6th Cir. 1983). Sixth Circuit case-law is in consensus on this point. See, e.g., Bouggess, 482 F.3d 886 (denying qualified immunity to officer who employed deadly force against a fleeing suspect without reason to believe that the suspect was armed or otherwise posed a risk of physical harm); Sigley v. City of Parma Heights, 437 F.3d 527, 537 (6th Cir. 2006) (denying qualified immunity to an officer who shot a fleeing suspect where, “[vjiewing the facts in a light most favorable to the plaintiff, [the officer] was running behind [the suspect’s] car, out of danger, and [the suspect] drove in a manner to avoid others on the scene in an attempt to flee.”); Dickerson, 101 F.3d at 1152 (holding that despite un-controverted evidence of serious danger to officers stemming from the suspect’s clear possession of a weapon, his recent firing of his weapon, and his threatening language toward the police, because it was undisputed that the suspect was nonthreatening when he was shot, the officer was not entitled to qualified immunity); Russo v. City of Cincinnati, 953 F.2d 1036, 1045 (6th Cir. 1992) (“[U]nder this court’s clearly established precedent, a person has ‘a right not to be shot unless he [is] perceived to pose a threat to the pursuing officers or others.’ ”) (quoting Robinson v. Bibb, 840 F.2d 349, 351 (6th Cir. 1988)); Bibb, 840 F.2d at 350 (holding that where an officer caught a suspect dismantling the officer’s car and then warned the suspect to stop, the officer was not entitled to qualified immunity for shooting and killing the suspect in mid-flight). This case law consensus has since been reaffirmed in cases like Godawa v. Byrd, 798 F.3d 457 (6th Cir. 2015) and Walker, 649 F.3d 502. Three cases in particular warrant further discussion: Smith v. Cupp, Sigley v. City of Parma Heights, and Kirby v. Duva, In Smith v. Cupp, 430 F.3d 766 (6th Cir. 2005), this Court addressed materially similar facts to the case at hand and held that the use of deadly force under the circumstances violated the Fourth Amendment. No subsequent controlling precedent has diminished the clarity of Cupp’s holding or its applicability to the present case. In Cupp, this Court concluded that an officer was not entitled to qualified immunity for his use of deadly force against a man fleeing in a car. In that case, the police officer had arrested the plaintiff, whom the officer perceived to be intoxicated, for making harassing phone calls in his presence. Id. at 769. The officer placed the compliant plaintiff in the back of his police cruiser while he went to talk with a tow truck driver. The plaintiff then moved from the back seat to the front and began to flee the scene in the police officer’s vehicle. The plaintiff drove the police vehicle toward the officer and the tow truck driver. The officer moved out of the way of the vehicle and fired four fatal shots at the plaintiff as he drove past. The officer claimed that the plaintiff had directed the vehicle at him and the tow truck driver and that he shot the plaintiff in self-defense. Id. at 770. The tow truck driver stated that the plaintiff may have redirected the vehicle in order to follow the direction of the road, rather than to target the officer and himself. Id. at 774. The tow truck driver also stated that the officer was “running towards the patrol car” when he fired shots at the plaintiff. Id. After considering the evidence under the plaintiffs version of events, this Court con-. eluded that the officer violated the plaintiffs constitutional rights. The Court stated: According to the plaintiffs’ evidence, [the officer] shot Smith after the police cruiser was past [the officer] and there was no immediate danger to anyone in the vicinity. [The officer’s] use of force was made even more unreasonable by the fact that Smith had been cooperative up to this point, and was arrested for the nonviolent offence of making harassing phone calls. Although there was some danger to the public from Smith’s driving off in a stolen police car, the danger presented by Smith was not so grave as to justify the use of deadly force. Id. at 773. The Court said that a reasonable officer in this position “would not have perceived danger to anyone at the scene,” including himself. Id. at 774. The Court further explained that, “[although this circuit’s previous cases give substantial deference to an officer’s decision to shoot an unarmed suspect in a car chase, the officer must have reason to believe that the car presents an imminent danger.” Id. at 775. Similarly, in Sigley, police arranged a controlled buy-bust operation to arrest a suspected ecstasy dealer. 437 F.3d at 529, An informant parked his vehicle next to the suspect’s, and the two completed a transaction through their driver’s side windows. Id. at 530. When the deal was complete, officers closed in, blocking the suspect’s car with their vehicles. Id. Several officers exited their vehicles, positioning themselves around the suspect’s vehicle, and ordered him to stop his vehicle. Id. In the plaintiffs version of events, the suspect was trying to maneuver his vehicle around the officers’ in an attempt to flee when an officer pointed his gun into the suspect’s driver’s side window and shot him in the back. Id. at 531. This Court denied qualified immunity to the officer, holding that, “viewing the facts in a light most favorable to the Plaintiff, [the officer] was running behind [the suspect’s] car, out of danger, and [the. suspect] drove in a manner to avoid others on the scene in an attempt to flee. Accepting these facts as true, [the officer] would have fair notice that shooting [the suspect] in the back when he did not pose an immediate threat to other officers was unlawful.” Id. at 537 (citing Garner, 471 U.S. at 11, 105 S.Ct. 1694 and Sample, 409 F.3d at 697). The majority contends that Cupp and Sigley are insufficiently similar to the facts in this case .in order for it to be clearly established that Phillips’ conduct violated the law. It is a truism that every case is distinguishable from every other. But the degree of factual similarity that the majority’s approach requires is probably impossible for any plaintiff to meet. Indeed, the majority’s attempt to meaningfully distinguish Cupp and Sigley is entirely unpersuasive. The majority says that these cases are different from the instant case insofar as “each involved little more than one or more officers confronting a car in a parking lot and shooting the driver as he attempted to initiate flight.” That is precisely the situation we have here.[1] Latits was shot as he ’was slowly backing away and attempting to resume his flight from police, Unlike the plaintiff in Mullenix, La-tits made ho threats, and he showed no intention to harm the officers or others. Absent some indication that Latits presented more of a threat than the suspects in Cupp or Sigley, preventing the resumption of a flight instead of a flight in the first instance is a distinction without a difference. Moreover, Kirby v. Duva, 530 F.3d 475 (6th Cir. 2008), invites even closer comparison. In Kirby, police officers surrounded the plaintiffs car during a traffic stop and opened fire on the vehicle when the plaintiff tried to escape. Viewing the facts in the light most favorable to the plaintiff, the evidence' showed that the plaintiff was attempting to manéuver his car in a nonthreatening manner around the officers and their vehicles and that he was “[n]ot [going] very fast.” Id. at 479 (alteration 'in original). Indeed, one witness testified that it looked like the plaintiff' “was trying to pull out of a parallel parking spot to get around [the officer’s vehicle].” Id. “More importantly, under [the plaintiffs] version of the story, none of the officers were ever in harm’s way.” Id. In these circumstances, the Court held that “[t]he plaintiffs’ version of the events ... supports a holding that defendants violated [the decedent’s] Fourth: Amendment right to be free from excessive force.” Id. at 482. The Court explained: Under that version, [the plaintiffs vehicle] was moving slowly and in' a non-aggressive manner, could not have hit any of the officers, and was stationary at the time of the shooting. Consequently, reasonable police officers in defendants’ positions would not have believed that [the plaintiff] ‘pose[d] a threat of serious physical harm, either to the officers] or to others.’ Id. (citing Garner, 471 U.S. at 11, 105 S.Ct. 1694). The Court further held that Gamer had clearly established that “police officers may not fire at non-dangerous fleeing felons.” Id. at 483. The majority attempts to distinguish Kirby on the grounds that “at the time he was shot, no one was in danger and his car was ‘blocked in’.”- This is a curious distinction to draw, when one considers that the-majority has concluded that in this case the Plaintiff similarly posed no danger to others. Officer Phillips presented no evidence that Latits was violent,' that he had a weapon, or that he was going to endanger other individuals in the area. All that can be said about Latits’ driving, based on the majority’s description of the events leading up to the shooting, is that he initiated' a chase “in which risk to the public was relatively low,” that he tried to maneuver around officers, like the plaintiffs in Sigley and Kirby, and that his vehicle was struck multiple times by the officers’ vehicles. Moreover, when Officer Phillips shot him, Latits had shown no intention to harm the police officers, and Phillips could see that no officers or other persons were in Latits’ path as he backed away. Under these circumstances, it would have been clear to any reasonable officer that they could not use deadly force against Latits. Again, applicable case law clearly establishes that an officer should not be protected by qualified immunity when the shooting victim poses no immediate danger to the officer or to the public. Our panel is unanimous in its conclusion that the officer in this cáse acted in an objectively unreasonable manner and needlessly cost a person his life. Because I also believe that Latits right not to be seized by deadly force when fleeing arrest was clearly established at the time he was killed, I respectfully dissent. . Although the majority correctly points out that Latits had just led police officers on a car chase for several minutes, if Dickerson tells us anything, it is that an officer’s conduct must be judged on the circumstances that confronted the officer at the time he took the action. 101 F.3d at 1152 (holding that although the plaintiff had been drunk and had fired nine shots inside his home prior to the officers’ arrival, officers were not justified in shooting him because at the time he was shot he was walking with his hands by his side officers).